IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

COLLEEN BARILLARI and : Civ. No. 3:12-CV-00034
WILLIAM BARILLARI :
: (Judge Brann)
        Plaintiffs, :
:
:
   v. :
:
SKI SHAWNEE, INC., :
:
        Defendant. :

**MEMORANDUM**
November 12, 2013

Before the Court is Ski Shawnee, Inc.'s ("Defendant") motion for summary

judgment in the negligence action filed by Colleen Barillari and William Barillari

("Plaintiffs"). The complaint alleges Colleen Barillari suffered an injury and

William Barillari suffered a corresponding loss of consortium, both caused by the

Defendant's alleged negligence. See Pls.' Compl. 9–13, Jan. 6, 2012, ECF No. 1.

The Defendant moves for summary judgment in its favor on two related, but

alternative theories relying on the assumption of the risk doctrine: first, that the

Plaintiffs' claims are barred by the Pennsylvania Skier's Responsibility Act, 42 Pa.

C.S.A. § 7102(c); or, alternatively, that the claims are barred by the traditional

common law assumption of the risk doctrine. See Def.'s Br. Supp. Mot. Summ. J.

1

5–9, Dec. 3, 2012, ECF No. 17 [hereinafter Def.'s Br.].  The Court hereby denies the Defendant's motion for summary judgment on both theories for the reasons that follow.

## I.    BACKGROUND

This case arises from an accident Mrs. Barillari suffered at the Shawnee Mountain Ski Area, Monroe County, Pennsylvania, on January 10, 2010.  Def.'s Statement Material Facts ¶ 1, Dec. 3, 2012, ECF No. 18 [hereinafter Def.'s SOF].  Although Mrs. Barillari had skied previously, she was not a ticketed skier that day.  Def.'s SOF ¶¶ 3–4; Pls.' Answer Statement Facts ¶ 3, Dec. 19, 2012, ECF No. 19 [hereinafter Pls.' SOF].  On that particular occasion, she came to the ski area to watch her husband and her children take ski lessons.  Def.'s SOF ¶¶ 6–13.

The accident occurred while Mrs. Barillari was standing on the snow of the slope close to tape that divided a ski run from the instruction area where Mr. Barillari was taking a lesson.  See Def.'s SOF ¶¶ 12–13; Pls.' SOF ¶¶ 10–11. There was a sign that read: "ATTENTION A Ticket or a Pass is Required to be on the Snow."  Def.'s SOF ¶ 19.  Nevertheless, Ski Shawnee, Inc. employees admitted that the sign may be ambiguous and that its stated policy was not routinely enforced.  Pls.' SOF ¶ 19.

Mrs. Barillari was generally aware of the risks of collision between skiers.

2

Def.'s SOF ¶ 7.  At the time, however, she was not worried about skiers colliding with her because she believed that she was close enough to the dividing tape and there were other spectators in the area.  Def.'s SOF ¶¶ 15–17; Pls.' SOF ¶¶ 15–17.  Unfortunately for Mrs. Barillari, a skier did collide with her and caused an injury to her left leg.  Pls.' SOF, at 2.  The Court considers the legal arguments in light of these facts.

## II.    DISCUSSION

### A.    LEGAL STANDARDS

#### 1.    Summary Judgment

Summary judgment is appropriate when the court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could find for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the court considers the evidence on summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  Id. at 255.

The party moving for summary judgment bears the burden of establishing the nonexistence of a "genuine issue" of material fact.  In re Bressman, 327 F.3d

229, 237 (3d Cir. 2003) (internal quotations and citations omitted). The moving party may satisfy this burden by either submitting evidence that negates an essential element of the nonmoving party's claim, or demonstrating the other party's evidence is insufficient to establish an essential element of its claim. Id. at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Moreover, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must identify those facts of record which would contradict the facts identified by the movant." Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2003) (internal quotations and citation omitted).

In deciding the merits of a party's motion for summary judgment, the court's

role is to determine whether there is a genuine issue for trial, not to evaluate the evidence and decide the truth of the matter. <u>Anderson</u>, 477 U.S. at 249. Credibility determinations are the province of the factfinder, not the district court. <u>BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). Consequently, summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 54(a).

2.  <u>Pennsylvania Law Must Be Applied In This Case</u>

This case is before the Court as a diversity of citizenship action under 28 U.S.C. § 1332. The Plaintiffs are citizens of New Jersey, the Defendant is a Pennsylvania corporation with a principal place of business in Pennsylvania, and the amount in controversy is alleged to be over $75,000—consequently, diversity jurisdiction is proper. <u>See</u> 28 U.S.C. § 1332; Pls.' Compl., ¶¶ 1, 2, 46.

As this is a diversity action and Pennsylvania was the situs of the injury, this Court "must apply Pennsylvania law to the facts of this case." <u>Berrier v. Simplicity Mfg., Inc.</u>, 563 F.3d 38, 46 n. 11 (3d Cir. 2009) (citing <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64 (1938)).

B.  THE PENNSYLVANIA SKIER'S RESPONSIBILITY ACT DOES NOT APPLY TO THIS CASE

The Defendant asserts that the Plaintiffs' claims are barred by the

assumption of the risk doctrine. Def.'s Br., at 6. The Pennsylvania General Assembly expressly provided this doctrine as a defense in downhill skiing cases in the Comparative Negligence Statute. See 42 Pa. C.S.A. § 7102(c). The pertinent portion of the statute, commonly known as the Skier's Responsibility Act, reads:

> (c) Downhill skiing.—

>> (1) The General Assembly finds that the sport of downhill skiing is practiced by a large number of citizens of this Commonwealth and also attracts to this Commonwealth large numbers of nonresidents significantly contributing to the economy of this Commonwealth. It is recognized that as in some other sports, there are inherent risks in the sport of downhill skiing.

>> (2) The doctrine of voluntary assumption of risk as it applies to downhill skiing injuries and damages is not modified by subsections (a) and (a.1).[1]

42 Pa. C.S.A. § 7102(c).

The RESTATEMENT (SECOND) OF TORTS, § 496A, summarizes the essence of the assumption of the risk doctrine: "[a] plaintiff who voluntarily assumes a risk of harm arising from the negligent or reckless conduct of the defendant cannot recover for such harm." As the Supreme Court of Pennsylvania elucidated, "[t]he

---

[1]As a general rule, subsections (a) and (a.1) supplant the assumption of the risk doctrine with a system of comparative fault in most negligence cases. Nevertheless, assumption of the risk was expressly preserved for injuries arising from downhill skiing, as noted. See 42 Pa. C.S.A. § 7102; Hughes v. Seven Springs Farm, Inc., 563 Pa. 501, 762 A.2d 339, 341 (2000).

assumption of the risk defense, as applied to sports and places of amusement, has also been described as a 'no-duty' rule, *i.e.*, as the principle that an owner or operator of a place of amusement has no duty to protect the user from any hazards inherent in the activity." Chepkevich v. Hidden Valley Resort, L.P., 607 Pa. 1, 2 A.3d 1174, 1186 (2010) (citing RESTATEMENT (SECOND) OF TORTS, § 496A, cmt. C, 2).

Applying those principles to the Skier's Responsibility Act, that same court "made clear that this 'no-duty' rule applies to the operators of ski resorts, so that ski resorts have no duty to protect skiers from risks that are 'common, frequent, and expected,' and thus 'inherent' to the sport of downhill skiing." Chepkevich, 2 A.3d at 1186 (citing Hughes v. Seven Springs Farm, Inc., 563 Pa. 501, 762 A.2d 339, 343–44 (2000)). Consequently, "[w]here there is no duty, there can be no negligence, and thus when inherent risks are involved, negligence principles are irrelevant—the Comparative Negligence Act is inapplicable—and there can be no recovery based on allegations of negligence." Id.

The Supreme Court of Pennsylvania established a two-part analysis to determine whether a plaintiff was subject to the assumption of the risk doctrine adopted in the Skier's Responsibility Act. See Huges v. Seven Springs Farm, Inc. 762 A.2d at 343–44. "First, this Court must determine whether [the Plaintiff] was

engaged in the sport of downhill skiing at the time of her injury. If that answer is affirmative, we must then determine whether the risk of being hit . . . by another skier . . . is one of the 'inherent risks' of downhill skiing . . . ." Id. at 344. If both of these prerequisites are met, then summary judgment is appropriate because, as a matter of law, the Defendant would have had no duty to Mrs. Barillari. See id.

First, the Court considers whether Mrs. Barillari was "engaged in the sport of downhill skiing at the time of her injury." Id. As the court noted in Hughes v. Seven Springs Farm, Inc.:

> the sport of downhill skiing encompasses more than merely skiing down a hill. It includes those other activities directly and necessarily incident to the act of downhill skiing. Such activities include boarding the ski lift, riding the lift up the mountain, alighting from the lift, skiing from the lift to the trail and, after a run is completed, skiing towards the ski lift to start another run or skiing toward the base lodge or other facility at the end of the day.

Hughes, 762 A.2d at 344.

In that case, the court held that a plaintiff who was skiing towards the chair lift through an area at the base of the mountain where several trails converged when she was struck from behind by another skier could not recover because the assumption of risk doctrine applied. Hughes, 762 A.2d at 340, 345. Although the plaintiff "was not in the process of skiing downhill, but rather was propelling

8

herself towards the ski lift at the base of the mountain," the court found this action was within the scope of engaging "in the sport of downhill skiing." Id. at 344–45. The court noted that to decide otherwise would "interpret the Act, as well as the sport of downhill skiing, in an extremely narrow, hypertechnical and unrealistic manner." Id. at 344.

In Chepkevich v. Hidden Valley Resort, L.P., 601 Pa. 1, 2 A.3d 1174 (2010), the Supreme Court of Pennsylvania held that a skier's negligence action based on her fall from a ski lift was barred by the doctrine of assumption of the risk because she was engaged in the sport of downhill skiing and the fall was an inherent risk of that sport. Chepkevich, 2 A.3d at 1194–95. The court noted that "the clear legislative intent to preserve the assumption of the risk doctrine in this particular area, as well as the broad wording of the Act itself, dictates a practical and logical interpretation of what risks are inherent to the sport." Id. at 1187–88.

A number of other courts have addressed the scope of the Skier's Responsibility Act as well. See, e.g., Bjorgung v. Whitetail Reort, L.P., 550 F.3d 263 (3d Cir. 2008) (finding that a skier's claim based on the lack of safety netting, improper course plotting, or soft loose snow was barred because those were risks inherent in skiing); Burke v. Ski America, Inc., 940 F.2d 95 (4th Cir. 1991) (interpreting Pennsylvania law to find ski resort had no duty of care to injured skier

because a "double black diamond" slope with rocks and trees was an obvious inherent danger of skiing); Smith v. Seven Springs Farm, Inc., 716 F.2d 1002 (3d Cir. 1983) (Aldisert, J.) (finding that a skier's claim was barred by assumption of the risk when he chose to ski a steep, icy expert slope with unpadded poles for snowmaking equipment); Lin v. Spring Mountain Adventures, Inc., CIV. A. 10-333, 2010 WL 5257648 (E.D. Pa. Dec. 23, 2010) (holding that the Act barred a skier's claim because colliding with snow making equipment was an inherent risk); Savarese v. Camelback Ski Corp., 417 F. Supp. 2d 663, (M.D. Pa. 2005) (Caputo, J.) (holding that a skier was barred from recovery where the injury occurred when he attempted to board the ski lift when the bottom of the chair was not folded down for seating); Bell v. Dean, 5 A.3d 266 (Pa. Super. Ct. 2010) (finding that a skier assumed the risk of collision with a snowboarder such that the snowboarder could not be found negligent); Crews v. Seven Springs Mountain Resort, 874 A.2d 100 (Pa. Super. Ct. 2005) (holding that the risk of colliding with a drunk underage snowboarder was not a risk inherent in the sport of downhill skiing).

The case before the Court, however, is distinguishable from all of these cases—Mrs. Barillari was not "engaged in the sport of downhill skiing" at the time

of her collision, as required by the statute.[2]  Hughes, 762 A.2d at 344.  Although

someone wearing skis and standing in the area of Mrs. Barillari and the other

spectators on a momentary pause in their run may well have been "engaged in the

sport," that is an entirely different matter from someone who is purely a spectator.

See id.  Even though a collision with a skier is a prominent injury considered to be

inherent in the sport of skiing as contemplated by the statute and the courts, the fact

remains that Mrs. Barillari was merely a spectator not engaged in the sport.  See id.

If this Court were to include Mrs. Barillari as a person subject to the Skier's

Responsibility Act, it would necessarily extend the confines of Pennsylvania's law

beyond the scope of its current applicability.  That is not this Court's place, and the

Court declines to do so.  Instead, the Court must apply the law as Pennsylvania's

own Supreme Court has instructed.  See, e.g., Hughes, 762 A.2d at 344–45.

Consequently, the Court finds that the assumption of the risk doctrine, as

articulated in the statue and interpreted by courts, does not apply to bar Mrs.

Barillari's claim, because she was not "engaged in the sport of downhill skiing" at

---

[2] The Court recognizes that "engaged" may be defined as "greatly interested," which could suggest that spectators are "engaged in the sport of downhill skiing."  MERRIAM-WEBSTER'S NEW INTERNATIONAL DICTIONARY (3d ed. 2013).  As is apparent from the context of the relevant Supreme Court of Pennsylvania decisions, however, this is not the manner in which the court used the term "engaged."  See, e.g., Hughes, 762 A.2d at 344.  Rather, the context surrounding the court's usage of the term indicates a meaning closer to "occupied" or "employed" when using the phrase "engaged in the sport of downhill skiing."  See id.; MERRIAM-WEBSTER'S NEW INTERNATIONAL DICTIONARY (3d ed. 2013).

the time of her accident.  See Hughes, 762 A.2d at 344–45.

C.    TRADITIONAL ASSUMPTION OF THE RISK DOES NOT
      BAR THE PLAINTIFFS' CLAIMS

The Defendant asserts that, in the alternative, the traditional common law

defense of assumption of the risk should bar the claim.  Def.'s Br., at 6.  Although

Pennsylvania has severely limited the traditional assumption of the risk doctrine

and some courts have questioned its ongoing viability, the fact remains that

Pennsylvania courts continue to apply assumption of the risk in a variety of cases

outside the context of downhill skiing.  See, e.g., Zinn v. Gichner Systems Grp.,

880 F. Supp. 311 (M.D. Pa. 1995) (Caldwell, J.) (holding assumption of the risk

barred plaintiff's claim when he continued to work after landowner refused to

cover opening in which he was injured); Howell v. Clyde, 533 Pa. 151, 620 A.2d

1107 (1993) (finding that the plaintiff guest who helped secure gunpowder for a

firework cannon and participate in lighting it assumed the risk of his injury); see

also Rutter v. Ne. Beaver Cnty. Sch. Dist., 496 Pa. 590, 437 A.2d 1198, 1212

(1981) (Nix, C.J., dissenting) ("[T]his doctrine constitutes a necessary and viable

component of tort law.").

Borrowing Justice Antonin Scalia's memorable phrase concerning a

similarly limited but resurgent doctrine in another area of law, assumption of the

risk survives "[l]ike some ghoul in a late-night horror movie that repeatedly sits up

12

in its grave and shuffles abroad, after being repeatedly killed and buried." <u>Lamb's</u> <u>Chapel v. Ctr. Moriches Union Free Sch. Dist.</u>, 508 U.S. 384, 398 (1993). Nevertheless, the doctrine remains viable in certain circumstances, a monstrous hydra though it may be.

There are four different theoretical species of assumption of the risk—two of which are at issue in this case. <u>See</u> <u>Hughes</u>, 762 A.2d at 341–42; RESTATEMENT (SECOND) OF TORTS, § 496A, cmt. C. One form of this polymorphic doctrine is a voluntary assumption of the risk, where the plaintiff makes a conscious, voluntary decision to encounter a risk of which he is aware. <u>See</u> <u>Hughes</u>, 762 A.2d at 342; RESTATEMENT (SECOND) OF TORTS, § 496A, cmt. C, 3.

A second related corollary of the assumption of risk doctrine[3] is sometimes titled the "no-duty rule." It applies when a plaintiff tacitly agrees to relieve the defendant of a duty by entering a certain relationship with the defendant, when the plaintiff is then injured by an inherent risk of that activity, such as a spectator at a sporting event. <u>See</u> <u>Hughes</u>, 762 A.2d at 342; RESTATEMENT (SECOND) OF TORTS, § 496A, cmt. C, 3. As both of these manifestations of that intractable doctrine are at issue here, the Court addresses them in turn, first analyzing voluntary

---

[3] <u>See</u> <u>Berman v. Radnor Rolls, Inc.</u>, 374 Pa. Super. 118, 542 A.2d 525, 531 (1988) (discussing the discrete conceptual differences between voluntary assumption of the risk as an affirmative defense to a breached duty and the "no-duty" theory with its inherent absence of a duty).

assumption of the risk.[4]

### 1. Voluntary Assumption of the Risk Does Not Bar Plaintiff's Claim in this Case

As Judge A. Richard Caputo articulated when considering a case involving voluntary assumption of the risk: "[t]o grant summary judgement on [that basis] the court must conclude, as a matter of law: (1) the party consciously appreciated the risk that attended a certain endeavor; (2) assumed the risk of injury by engaging in the endeavor despite the appreciation of the risk involved; and (3) that injury sustained was, in fact, the same risk of injury that was appreciated and assumed." Bolyard v. Wallenpaupack Lake Estates, Inc., 3:10-CV-87, 2012 WL 629391, at *5 (M.D. Pa. Feb. 27, 2012) (Caputo, J.). This assumption of risk defense is established as a matter of law "only where it is beyond question that the plaintiff voluntarily and knowingly proceeded in the face of an obvious and dangerous condition." Barrett v. Fredavid Builders, Inc., 454 Pa. Super. 162, 685 A.2d 129, 131 (1996). Moreover, "[t]he mere fact one engages in activity that has some inherent danger does not mean that one cannot recover from a negligent party when injury is subsequently sustained." Bullman v. Giuntoli, 761 A.2d 566, 573

---

[4] The two remaining forms of assumption of the risk do not apply to this case. These are i) express assumption of the risk; and, ii) situations in which the plaintiff's conduct in voluntarily encountering a known risk is itself unreasonable. See Hughes, 762 A.2d at 341–42; RESTATEMENT (SECOND) OF TORTS, § 496A, cmt. C, 1, 4.

(Pa. Super. Ct. 2000).

The dispositive analytical point in the case before this Court is determining what constitutes a plaintiff's conscious appreciation of the risk. It is not enough that the plaintiff was *generally* aware that the activity in which he was engaged had accompanying risks. See Bolyard, 2012 WL 629391, at * 6 (citing Handschuh v. Albert Dev., 393 Pa. Super. 444, 574 A.2d 693 (1990)). Rather, the plaintiff must be aware of "the *particular* danger" from which he is subsequently injured in order to voluntarily assume that risk as a matter of law. Id.

For example, in Bolyard v. Wallenpaupack Law Estates, Inc., 3:10-CV-87, 2012 WL 629391, at *5–6 (M.D. Pa. Feb. 27, 2012), Judge Caputo held, *inter alia*, that assumption of the risk did not apply to a plaintiff who went snow-tubing on an old ski slope, hit a rut, and crashed into a tree. Judge Caputo recognized that, while the plaintiff "was generally aware that snow tubing on a tree-lined trail was dangerous, there [was] no evidence in the record that she had any knowledge of the specific hazards of that particular slope." Bolyard, 2012 WL 629391, at *6. This was a material distinction, such that the elements of voluntary assumption of the risk remained unsatisfied—therefore, as a matter of law, the plaintiff did not assume the risk. Id.

Similarly, in Handschu v. Albert Development, 393 Pa. Super. 444, 574

A.2d 693, 696 (1990), the court held that assumption of the risk did not apply when a plumbing contractor sustained injuries and died because a trench in which he was laying pipe collapsed.  The court noted that the plaintiff was aware of the general risk of ditch collapses and that the particular job would be delicate. Handschu, 574 A.2d at 694.  Nevertheless, that awareness of the general risks was not sufficient "to compel a finding of a waiver of an individual's right to complain about a breach of duty of care to the risk taker."  Id. at 696 (original punctuation altered).

In the case before the Court, Mrs. Barillari did not voluntarily assume the risk of her injury under this doctrine because there are no facts demonstrating she was *specifically* aware of the risk of the type of harm she suffered—namely, a skier crashing into a spectator.  See Bolyard, 2012 WL 629391, at *5–6; Handschu, 574 A.2d at 694, 696; Pls.' SOF ¶ 5.  It is undisputed that Mrs. Barillari was aware of the general risks and dangers inherent in the sport of skiing.  She was aware collisions between skiers occurred and she "was worried about [her] children with that."  Def.'s SOF, Oral Dep. Mrs. Barillari 23, Dec. 03, 2012, ECF No. 18, Exh. 5. There is not, however, anything in the record that indicates Mrs. Barillari was specifically aware of the danger that later befell her.

Rather, Mrs. Barillari stated she was not worried about a skier crashing into

16

her, "because [she] was close enough to the ribbon and [she] was with other people that were just watching. [She] wasn't standing with a bunch of skiers. [She] was standing with spectators." Id. at 63–64. Like the plaintiffs in Bolyard and Handschu, Mrs. Barillari did not possess the requisite conscious appreciation of the *specific* risk of harm that caused her injury. Bolyard, 2012 WL 629391, at *5–6; Handschu, 574 A.2d at 694, 696. Therefore, the doctrine of voluntary assumption of the risk is inapplicable to this case. See id.

### 2. The "No-Duty" Rule Does Not Apply

The "no-duty" theory, a corollary species of assumption of the risk discussed previously in the context of the Skier's Responsibility Act, applies at common law when: "the plaintiff has entered voluntarily into some relation with the defendant which he knows to involve the risk, and so is regarded as tacitly or impliedly agreeing to relieve the defendant of responsibility, and to take his own chances." Hughes, 762 A.2d at 341 (citing RESTATEMENT (SECOND) OF TORTS, §496A, cmt. C, 2). "Again the legal result is that the defendant is relieved of his duty to the plaintiff." Id.

The no-duty rule applies most prominently in the context of a spectator at a sporting event, such as a fan hit by a foul ball at a baseball game. See, e.g., Schentzel v. Philadelphia Nat'l League Club, 173 Pa. Super. 179, 96 A.2d 181

(1953). As the RESTATEMENT observes, "a spectator entering a baseball park may be regarded as consenting that the players may proceed with the game without precautions to protect him from being hit by the ball." RESTATEMENT (SECOND) OF TORTS, §496A, cmt. C, 2.

"In Pennsylvania, the law imposes 'no duty' to protect spectators from risks that are common, frequent, and expected [in the sport]." Petrongola v. Comcast-Spectacor, L.P., 789 A.2d 204, 210 (2001). "However, a facility may be held liable if the design of the facility deviates from the established custom in some relevant way." Id. "The central question, then, is whether [a plaintiff's] case is governed by the 'no-duty' rule applicable to common, frequent and expected risks of [the sport] or by the ordinary rules applicable to all other risks which may be present [at a sporting facility]." Jones v. Three Rivers Mgmt. Corp., 483 Pa. 75, 394 A.2d 546, 551 (1978).

For example, in Schentzel v. Philadelphia National League Club, 173 Pa. Super. 179, 96 A.2d 181, 1986–92 (1953), the no-duty rule barred the claim of a plaintiff hit by a foul ball in the stands at a baseball game. The court noted that, even though there was scant evidence the plaintiff knew about the prevalence of foul balls, the defendant owed her no duty because foul balls are an inherent risk of attending a baseball game. Schentzel, 96 A.2d at 186–92.

In <u>Loughran v. The Phillies</u>, 888 A.2d 872, 876–77 (Pa. Super. Ct. 2005), a

majority of the court held that the no-duty rule barred a spectator's claim for

injuries suffered in the stands at a baseball game.  There, the center-fielder threw

the ball into the stands after catching it for the final out of the inning—as is

customarily done to provide souvenirs for fans—when the unsuspecting plaintiff

was hit and injured by the ball.  <u>Loughran</u>, 888 A.2d at 874.  Although this was not

the typical foul ball hit into the stands, the majority considered this custom to be

inherent in the sport.  <u>Id.</u> at 877.  They noted that the plaintiff failed to establish the

defendants "deviated from the *common and expected* practices of the game of

baseball."[5]  <u>Id.</u>

By contrast, in <u>Jones v. Three Rivers Management Corporation</u>, 394 A.2d

546, 548, 552–553 (1978), the court held that the no-duty rule did not apply

because the patron was hit by a ball while using an interior walkway to the

concessions area, rather than while seated in the stands.  The court noted that "in a

---

[5]  Judge John T. Bender dissented from this majority opinion, writing:

> since the act of tossing a ball to fans as a souvenir is extraneous to the game and
> not necessary to the playing of the game, a spectator does not "assume the risk" of
> being struck by a ball entering the stands for this purpose, nor is there any valid
> reason in law or policy to extend the immunity of the "no duty" rule to this
> practice.  Rather, if a baseball player wants to go beyond the confines of the game
> . . . he should be charged with the obligation of doing it in a reasonably safe and
> prudent manner.

<u>Loughran</u>, 888 A.2d at 882.

'place of amusement' not every risk is reasonably expected." Jones, 394 A.2d at 551. That particular injury was due to a failure in the ballpark's design such that the no-duty rule should not apply. Id. at 551–52.

The Jones court also drew a distinction between risks that are merely inherent in the activity, and those risks that are not only inherent but also *necessary* to the activity. See id.; see also Loughran, 888 A.2d at 880 (Bender, J., dissenting) ("A careful reading of Jones, reveals that the no-duty rule applies not just when one's injury is caused by a risk inherent to the activity, but also when the risk in question is necessary to the activity."). For example, while foul balls in the stands are an inherent and necessary part of any baseball game, a bat flying into the stands is an inherent risk of baseball but not a necessary component of the game. Jones, 394 A.2d at 551; see also Schentzel, 96 A.2d at 182 ("There is a million foul balls, maybe three or four or five an inning, goes into the stand [sic].").

The court further illuminated this distinction with analogies, writing that: "[m]ovies must be seen in a darkened room, roller coasters must accelerate and decelerate rapidly and players will bat balls into the grandstand." Id. at 550–51. As Judge John T. Bender poignantly extrapolated in his Loughran dissent:

> if movie houses are made to lighten the theatres so that
> no one trips, the movie-going experience would be
> greatly diminished if not destroyed. If amusement parks
> are made to design roller coasters so as to eliminate all

> jerkiness and smooth out all changes in direction they
> would no longer be capable of being classified as "thrill
> rides" and the word "amusement" might be deleted from
> the term "amusement parks." But if baseball players and
> their employers, are charged with exercising reasonable
> care in the practice of providing souvenir balls to patrons,
> the "Fall Classic" will remain a classic sporting contest
> and all those regular season and playoff games preceding
> it would still be played in a manner consistent with
> Abner Doubleday's original intent.

Loughran, 888 A.2d at 881.

According to the principles discussed in Jones and Loughran, the no-duty rule can be said to apply when, to avoid injury, a "place of amusement" must alter conditions at the facility in such a way that would change the very essence of the activity for which it is made. See Loughran, 888 A.2d at 881; Jones, 394 A.2d at 550–52. This does not affect the duty of sports facilities and places of amusement to protect patrons against foreseeable risks not inherent and necessary such that they are "common, frequent, and expected" in the very essence of that central activity. Jones, 394 A.2d at 551

Applying these principles to the case before the Court, the no-duty rule cannot protect the Defendant and bar Mrs. Barillari's claim. The Defendant asserts that this case is directly analogous to the example of a spectator at a baseball game being hit by a foul ball—Mrs. Barillari was a spectator by a ski slope that was hit by a skier. See Def.'s Br., at 8–10. Although a skier crashing into spectators may

be a foreseeable risk inherent in the sport of skiing, it is not a *necessary* and inherent element of that sport. See Jones, 394 A.2d at 551–52.

A majority of fans attend a baseball game expecting to see a number of foul balls hit into the stands. See Schentzel, 96 A.2d at 182. The Court is not aware of a similar majority that assumes they will see a number of skiers crash violently into spectators on a day trip to the mountain.

Furthermore, charging ski facilities with the ordinary duty of care to protect spectators from ski crashes, rather than shielding them with "no-duty," will not in any way affect the essence of skiing. See Loughran, 888 A.2d at 881. The ski resort may erect mesh fences, snow walls, ropes, and other sorts of precautions around the sides and at the base of the slopes without impeding the rhythmic descent of countless alpine enthusiasts.

Therefore, the issues in this case do not present an instance where the "no-duty" rule applies. Rather, the existence of any negligence by either or both parties should be submitted to a jury.

## III. CONCLUSION

For the foregoing reasons, Ski Shawnee Inc.'s motion for summary judgment is denied.

An appropriate Order follows.

BY THE COURT:

s/ Matthew W. Brann
Matthew W. Brann
United States District Judge